# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TIMOTHY THIESING and AMERICAN
ORTHODONTICS CORPORATION,

        Plaintiffs,

        v.                             Case No. 09-C-359

DENTSPLY INTERNATIONAL, INC. and
GAC INTERNATIONAL, LLC, a division of
DENTSPLY INTERNATIONAL, LLC,

        Defendants.

## DECISION AND ORDER

After the plaintiffs, Timothy Thiesing ("Thiesing") and American Orthodontics Corporation ("AO"), filed a complaint against the above-named defendants in Sheboygan County Circuit Court on March 13, 2009, asserting a series of claims related to an employment agreement, the defendants, Dentsply International, Inc. ("Dentsply") and GAC International, LLC ("GAC"), filed a Notice of Removal in the United States District Court for the Eastern District of Wisconsin on April 6, 2009, pursuant to 28 U.S.C. § 1441(a). The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a)(3) because the defendant is subject to personal jurisdiction in this district. All parties have consented to the exercise of jurisdiction by a magistrate judge. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

On January 15, 2010, Dentsply and GAC filed a motion for summary judgment. Thiesing and AO filed a motion for summary judgment on that same day. These motions have now been fully briefed and are ready for resolution.

# I.  FACTUAL BACKGROUND

The facts of this case are largely undisputed for purposes of the parties' motions.  In 2001, Thiesing was hired as a sales representative by GAC, one of twenty-five divisions of Dentsply. (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶¶ 5, 11, 15.)  Dentsply, a Delaware corporation headquartered in York, Pennsylvania, is the largest manufacturer of dental prosthetics and consumable dental products in the world.  (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 6.) Dentsply's various divisions sell products ranging from crowns, bridges, and dentures to anesthetics to products used by endodontists for root canals to material used as fillings.  (PPFOF ¶ 7.)  GAC manufactures and sells orthodontic supplies and products.  (DPFOF ¶ 8.)  In addition to selling products manufactured by GAC, GAC sales representatives also sell products manufactured by three other Dentsply divisions, Raintree-Essix, Glenroe, and Dentsply Caulk.  (PPFOF ¶ 14.)

After being hired, GAC sales representatives go through extensive product and administrative procedure training.  (DPFOF ¶¶ 35-37.)[1]  In addition, GAC sales representatives have computer access to only their accounts—they do not have access to accounts outside their region.  (DPFOF ¶ 34.)  GAC sales representatives also receive information regarding purchasing history of the accounts, a three-year snapshot of each particular account by product class, part number, and account number, as well as marketing information, sales sheets, newsletters, and some advertising.  (DPFOF ¶¶ 33, 41.)  Certain employees of GAC were told both verbally and in writing that some information disclosed to them was confidential, including pricing information and new product marketing launches, and GAC's price list is identified as confidential.  (DPFOF ¶¶ 42, 44, 45.)  Other examples of confidential information disclosed by Dentsply or its divisions to its sales representatives include

---

[1] Notwithstanding, much of the knowledge of the products of GAC's competitors is acquired in the field as the sales representatives service GAC customers.  (DPFOF ¶ 38.)

product placement, the structure of the buyer groups and the pricing given to the buyer groups, information regarding company accounts, architecture of the brackets, and product design. (DPFOF ¶¶ 43, 46.)

While employed by GAC, Thiesing resided in Minneapolis, Minnesota. (PPFOF ¶ 15.) Thiesing's territory as a sale representative for GAC was Minnesota, North Dakota, and South Dakota, and the mid and upper part of Wisconsin. (DPFOF ¶ 15.) Upon commencing employment, GAC sales representatives are assigned their territory by zip code and are given a list of accounts (that have purchased products from GAC) located in the territory that he or she is going to be covering. (DPFOF ¶¶ 30-31.) While employed by GAC, 62% of Thiesing's accounts were located in Minnesota, 18% of his accounts were located in Wisconsin, and a combined total of 20% were located in North and South Dakota. (DPFOF ¶ 17.) Furthermore, Thiesing's client contacts were based upon how much maintenance was needed, whether it be as often as once a month or as infrequently as once or twice a year. (DPFOF ¶ 47.)

As a sales representative, Thiesing was a top performer, generating approximately $3 million in annual sales. (DPFOF ¶ 48.)[2] While Thiesing believes his personal tenacity was the reason behind his tremendous success, Mike Harvel, Thiesing's Regional Manager, believed Thiesing's success was due to his ability to present products and develop relationships with his accounts. (DPFOF ¶¶ 49-50.) Nevertheless, according to another longstanding employee of GAC, which company an orthodontist purchases products from depends on a number of factors, the most important of which is the sales representative, followed by the product line, service, and then pricing. (DPFOF ¶ 52.)

---

[2] By letter dated March 2, 2010, the plaintiffs indicated that they were withdrawing their argument that the affidavit of Peter Kores ("Kores") and Chris Bodish ("Bodish") should be excluded on the grounds that these individuals were not disclosed pursuant to Fed. R. Civ. P. 26(a). Where appropriate, the court will disregard such objections to the defendants' proposed facts, finding that the evidence, rather, is undisputed.

In the spring of 2004, Thiesing attended an annual meeting of all GAC sales representatives in Dallas, Texas. (PPFOF ¶ 20.) At this time, Dentsply presented all GAC sales representatives with a Dentsply International, Inc. Employment Agreement ("Employment Agreement") to sign as a condition of employment. (PPFOF ¶ 20; DPFOF ¶ 22.) The Employment Agreement contains a post-employment restrictive covenant, which reads as follows:

> 6.   I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION or, in the event I am a sales representative, I will not work for CONFLICTING ORGANIZATION in geographic areas in which I worked while employed by the Company, for a period of two (2) years after termination of my employment with the Company[,] except that I may accept employment with a CONFLICTING ORGANIZATION, whose business[] is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the Company, prior to my accepting such employment shall receive separate written assurances satisfactory to the Company from such CONFLICTING ORGANIZATION and from me, that I will not render services, directly or indirectly, in connection with any CONFLICTING PRODUCT.

(PPFOF ¶ 24.) At that time, Phyllis Yoos, GAC's Human Resources representative "made a presentation at the meeting regarding the Employment Agreement." (DPFOF ¶¶ 22, 24.) Were any Dentsply employee to refuse to sign the Employment Agreement, he or she would not continue their employment with Dentsply. (DPFOF ¶ 23.) Accordingly, Thiesing signed the Employment Agreement and returned it to GAC Regional Manager, Mike Harvel. (DPFOF ¶ 26.)

Almost five years later, in January 2009, Thiesing contacted Mike Haskett and Lee Tuneberg ("Tuneberg"), Executive Vice President of AO, regarding his interest in partnering with AO. (DPFOF ¶¶ 54-55.) AO, like Dentsply, is a manufacturer of brackets, bands, wires, and related products used by orthodontists and other dental professionals to straighten teeth, and it sells products through a network of sales representatives, exclusive distributors and subsidiaries, each responsible for a particular territory. (PPFOF ¶¶ 1-2.) After Tuneberg told Thiesing to send his resume and the

4

Dentsply Employment Agreement to AO, Thiesing met with Todd Remmel ("Remmel"), the Director of Sales for AO, Mike Bogenschuetz, the President of AO, and Tuneberg in Sheboygan, Wisconsin on February 13, 2009. (DPFOF ¶¶ 55, 57-58.) The topic of conversation at this meeting was the orthodontics industry in general, family, and other matters. (DPFOF ¶ 59.)

Before meeting with Thiesing, both Tuneberg and Remmel received a copy of and reviewed Thiesing's Employment Agreement. (DPFOF ¶¶ 60-61.) Bogenschuetz was also aware of the Employment Agreement before he and Tuneberg decided to offer employment to Thiesing on behalf of AO. (DPFOF ¶¶ 62, 64.) Remmel thereafter telephoned Thiesing to offer him employment with AO, and on March 12, 2009, Thiesing received an e-mail message from the Director of Human Resources for AO, welcoming him to AO's sales team and providing him with information regarding pre-employment requirements and documentation. (DPFOF ¶¶ 65, 69.) On March 11, 2009, Thiesing sent his notice of resignation to GAC representatives. (DPFOF ¶ 75.) However, Thiesing was released from GAC effective March 19, 2009, immediately upon GAC and Dentsply learning of this action and Thiesing's employment with AO. (DPFOF ¶ 83.)

Although AO, in April 2009, was looking for sales representatives in New Jersey and northern California, AO assigned Thiesing to perform sales in Minnesota, North Dakota, South Dakota, parts of Wisconsin, and Iowa. (DPFOF ¶¶ 66-67; PPFOF ¶ 40.) Moreover, AO hired Thiesing because of his familiarity with the accounts in the Dakotas as well as his knowledge of the orthodontists in Minnesota. (DPFOF ¶ 68.) As a sales representative for AO, Thiesing is selling the same product lines for AO that he sold when at GAC, including products such as metal brackets, some self-ligating brackets, cosmetic brackets, some tubes, bands, adhesives, elastomeric wires, instruments, and mini screws. (DPFOF ¶¶ 84-85.) Furthermore, Thiesing is now actively soliciting his old GAC customers and contacting orthodontists in his old GAC territory. (DPFOF ¶¶ 84, 86.)

As of the end of August 2009, Thiesing sold AO products to over seventy customers that he sold products to when he worked at GAC. (DPFOF ¶ 87.)

## II. STANDARD OF REVIEW

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 630 (7th Cir. 2009). To state it differently, a party will be successful in opposing summary judgment only

when they "present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) (citing *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)). The evidence must create more than "some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

This action stems from a non-compete provision Thiesing signed as an employee of GAC. The defendants move for summary judgment, arguing that the Employment Agreement is enforceable. The defendants also argue that Thiesing breached the Employment Agreement, that AO tortiously interfered with the Employment Agreement, and that Thiesing and AO tortiously interfered

with GAC's business expectancy and relations.

Thiesing and AO also move for summary judgment, contending that the Employment Agreement is unenforceable because the post-employment restrictive covenant is vague, ambiguous, overly broad, and unnecessary to protect Dentsply's legitimate business interests. According to the plaintiffs, the Employment Agreement is also unenforceable because it is not supported by consideration. Because the Employment Agreement is unenforceable, argue the plaintiffs, the defendants' remaining counterclaims should be dismissed because all claims are premised on the existence of an enforceable contract.

Before any analysis of the substantive law at issue in the present action, the absence of a choice of law clause in the Employment Agreement necessitates a choice of law analysis. While the plaintiffs contend that Wisconsin law governs the interpretation of the Employment Agreement, the defendants contend that Minnesota law governs.

## A. Choice of Law.

Because it is apparent that a conflict of laws exists regarding the treatment of non-compete agreements, I begin with the choice of law issue. A federal court sitting in diversity looks to the conflict-of-laws rules of the forum state for the applicable substantive law. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The forum state in this case is Wisconsin, and therefore, I must look to Wisconsin conflict-of-laws rules.

The Wisconsin Supreme Court adopted the grouping-of-contacts approach embodied in § 188 of the Restatement (Second) of Contracts for the resolution of conflicts questions pertaining to the validity and rights created by the provisions of a disputed contract. *See Urhammer v. Olson*, 39 Wis. 2d 447, 450, 159 N.W.2d 688-89 (1968). To determine the applicable law to an issue, § 188 provides

that the following relevant factors are to be taken into account: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. *Haines v. Mid-Century Ins. Co.*, 47 Wis. 2d 442, 446, 177 N.W.2d 328, 330 (1970). Under the conflicts analysis, "the method is not to count contacts but rather to consider which contacts are the most significant and to determine where those contacts are found." *Id.*

After analyzing the facts of this case in light of the contacts listed in § 188 of the Restatement, I conclude that Minnesota law controls because that state's contacts are of greater significance than those of Wisconsin's. Here, the first two factors are non-starters. Thiesing signed the non-compete agreement in Texas, while at a company event, and the parties agree that no negotiations over the contract occurred. With respect to the place of performance of the contract and the location of the subject matter of the contract, there is no dispute that Minnesota, Wisconsin, North Dakota, and South Dakota comprised Thiesing's sales territory as a sales representative for GAC. Putting aside Thiesing's contacts with the Dakotas, Thiesing maintained more accounts in Minnesota than in Wisconsin, with 62% of his accounts in Minnesota as compared to 18% of his accounts in Wisconsin.[3]

Finally, with respect to the domicile of the parties, Dentsply was incorporated in Delaware, Dentsply has its principal place of business in Pennsylvania, and the principal place of business of GAC is in New York. Thiesing resided in Minnesota (and still does), and he indicates that he also worked out of his home in Stone Lake, Wisconsin, although there is no mention of how often Thiesing worked out of his Wisconsin home. Any guess as to how Thiesing split his time would be

---

[3] Because Thiesing's contacts with North and South Dakota were more sparse than with the other two states, these contacts are not significant enough to make the law of either state the governing law.

speculation; however, for purposes of the pending motion, were the court to assume that at most, Thiesing worked an equal amount of time in Minnesota and Wisconsin, the fact remains that the majority of his customer contacts were in Minnesota and Thiesing resided in Minnesota.

Admittedly, the contacts to Minnesota are not as significant as the contacts to Texas were in *Extrusion Dies Indus., LLC v. Cloeren Inc.*, No. 08-cv-323-slc, 2008 WL 4401219 (W.D. Wis. Sept. 24, 2008), or the contacts to New York were in *Rototron Corp. v. Lake Shore Burial Vault Co., Inc.*, 553 F. Supp. 691 (E.D. Wis. 1982). In both of those cases, the law applied was the law of the state in which the allegedly aggrieved party resided. Nevertheless, the alleged aggrieved parties in this case, Dentsply and GAC, reside in Pennsylvania and New York, respectively. Neither the plaintiffs nor the defendants in this case argue that the law of either of these states is applicable. Therefore, the court is left to weigh the remaining contacts to Minnesota and Wisconsin in light of factors set forth in § 188 of the Restatement. Accordingly, while Dentsply is not a Minnesota corporation, which may appear contrary to Minnesota's interest in protecting Minnesota employers, Thiesing's Minnesota residency and larger Minnesota customer base make it more likely that Thiesing, Dentsply, and GAC would have suspected Minnesota's laws and policies to govern the determination of any contract issue as opposed to the laws and policies of Wisconsin.

Moreover, Thiesing's attempt to liken his case to *Haines* fails. In *Haines*, the Wisconsin Supreme Court concluded that applying a Minnesota law that gave effect to a family exclusion insurance policy would violate an important public policy of Wisconsin because Wisconsin law provided that family exclusion provisions were void. 47 Wis. 2d at 447-48, 451, 177 N.W.2d 331, 333. Thiesing argues that the same principle applies here because the application of Minnesota law, which permits blue-penciling of overbroad employment contracts, would override a key public policy in Wisconsin that favors free competition and employee mobility. (Pls.'s Mot. at 12.)

10

The case here is easily distinguishable from *Haines*, however. It was only because the *Haines* court found that the significant contacts were split between Minnesota and Wisconsin that it turned to a second five-factor test. *Haines*, 47 Wis. 2d at 450-51, 177 N.W.2d at 332-33; *see also Extrusion Dies Indus.*, 2008 WL 4401219, at *2 (stating that "[i]f-and presumably only if-it is not clear that the nonforum contacts are of greater significance, then at least in tort cases, maybe in others, the court must apply the second test, which involves five 'choice-influencing factors'"). The *Haines* court found the fifth factor, the application of the better rule of law, determinative, which is to say that it found that Wisconsin's rule of law was better than that of Minnesota's. *See* 47 Wis. 2d at 451, 177 N.W.2d at 333. Unlike the contacts in *Haines*, the contacts are not split between the two states in this case, and therefore, it is unnecessary to seek guidance outside of § 188 of the Restatement.[4]

To support his argument that Wisconsin has the strongest relationship to this dispute, Thiesing also highlights the anticompetitive effect of the restrictive covenant on AO. As a Wisconsin corporation, "Wisconsin has a strong interest in ensuring that [AO] is able to recruit and hire employees to work in Wisconsin without being subject to another state's law that does not share Wisconsin's strong public policy in favor of employee mobility." (Pls.'s Mot. at 9-10.) However, AO was not a party to the contract, was not involved in the negotiations, and AO played no part in the performance of the Employment Agreement. At the time of contracting, it was not any more foreseeable that Thiesing would later find work for a Wisconsin corporation than he would find work

---

[4] More recently, a United States District Court for the Western District of Wisconsin stated that Wisconsin law "applies different analyses depending on whether the issue presented is a question of contract law or tort law." *McCraw v. Mensch*, 461 F. Supp. 2d 872, 877 (W.D. Wis. 2006). According to the *McCraw* court, the "grouping-of-contacts" factors govern the choice of law determination if a contract issue is presented, while the "choice-influencing" factors, which the court resorted to in *Haines*, are reserved for determining the choice of law if a tort issue is presented. *See id.* at 877-78. Whether the different sets of factors are exclusive of one another with respect to contract issues need not be the focus of the court's analysis, however, because the significant contacts here are not split between Wisconsin and Minnesota.

in any other state, including North and South Dakota.  Therefore, while Wisconsin may have an interest in ensuring that AO is able to freely recruit employees, this is simply not a factor in the grouping-of-contacts approach.

Minnesota was the place of performance, the location of the subject-matter of the contract, and the residence of Thiesing.  While there exist some contacts to Wisconsin, they are not as significant as the contacts to Minnesota.  Accordingly, Minnesota law will govern the interpretation of the Employment Agreement.

**B.  Restrictive Covenant.**

The plaintiffs challenge the validity of the restrictive covenant on two grounds.  First, they argue that it was not supported by consideration, and therefore, it is not enforceable.  Second, they argue that the covenant not to compete is not enforceable because it is overly broad and imposes an unnecessary hardship on Thiesing.  Because the covenant not to compete is unenforceable, the plaintiffs argue that the defendants' remaining counterclaims, which depend upon a valid contract, should be dismissed.

**1.  Validity of the Restrictive Covenant.**

When covenants not to compete are not ancillary to an employment contract, the covenant must be supported by independent consideration. *See Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982).  Under Minnesota law, consideration is something of value given in return for performance or promise of performance. *See In re MJK Clearing, Inc.*, 408 F.3d 512, 515 (8th Cir. 2005) (citing *E.J. Baehr v. Penn-O-Tex Oil Corp.*, 258 Minn. 533, 104 N.W.2d 661, 665 (Minn. 1960)).  Whether consideration is adequate to validate a covenant not to compete is fact dependent. *See Cashman*, 323 N.W.2d at 741 (quoting *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 130 (Minn. 1980)).

Here, Thiesing signed the Employment Agreement approximately three years after beginning his employment with GAC when Dentsply conducted a mass signing of agreements with all employees, and therefore, the covenant must be supported by independent consideration. It is undisputed that Thiesing was given no bonus or pay raise at the time he signed the Employment Agreement. The defendants, however, contend that Thiesing's continued employment constituted sufficient consideration, and alternatively, that the post-employment compensation outlined in the Employment Agreement constituted sufficient consideration.

### a. Continued Employment.

"The mere continuation of employment can be used to uphold coercive agreements, but the covenant must be bargained for and provide the employee with real advantages." *Freeman v. The Duluth Clinic, Ltd.*, 334 N.W.2d 626, 630 (Minn. 1983) (citing *Davies*, 298 N.W.2d at 130-31). In *Davies*, the court found that continuation of employment was adequate consideration because the employee "derived substantial economic and professional benefits from the agency after signing the contract," including steadily advancement through the company that would not have been possible had he not signed the contract, informal training, and sole responsibility of the employer's customers. 298 N.W.2d at 131.

Relying on *Davies*, the defendants contend that Thiesing's continued employment with GAC constituted sufficient consideration to validate the restrictive covenant. The defendants' reliance is misplaced, however, because continuation of Thiesing's employment is distinguishable from the continuation of employment in *Davies*. Unlike in *Davies*, there is no evidence that Thiesing received additional training by virtue of signing the Employment Agreement, or that he was given more responsibilities as a result of having entered into the agreement. Rather, it appears that all of his training occurred when he first began his position as a GAC sales representative, and that his

responsibilities as a GAC sales representative remained constant throughout. Moreover, there is no evidence that signing the Employment Agreement allowed him to advance his position with GAC.

In fact, had he not signed the Employment Agreement, Theising would have lost his job, which not only distinguishes his case from Davies' case but also indicates that the agreement was not bargained for. The defendants conducted a mass signing by all employees who were instructed that if they did not sign the agreement, their position with the company would be terminated. Such conduct would not have led Theising to believe that he could negotiate the agreement. *See Dentsply Int'l, Inc v. Benton*, 965 F. Supp. 574, 579-80 (M.D. Penn. 1997). Because the covenant was not bargained for and because it provided Theising with no real advantages, continued employment with GAC does not provide adequate consideration to support Theising's non-compete agreement.

**b. Post-Employment Compensation.**

Dentsply contends that consideration can be found in Paragraphs 7 and 10 of the Employment Agreement, which together promise Theising post-employment compensation in the event that the covenant not to compete prohibits Theising from obtaining employment or results in a lesser-paying position. Paragraph 7 of the Employment Agreement states the following:

> 7. If I am unable to obtain employment consistent with my training and education solely because of the provisions of this Agreement with respect to employment by a CONFLICTING ORGANIZATION, such prohibition shall bind me only as long as the Company shall make payments to be equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits provided that, if my compensation was comprised of over thirty percent [30%] commission over the last three [3] years of my employment, then the Company shall pay me my monthly base pay plus my average monthly commissions during such three [3] year period) for each month of such unemployment for a period not to exceed two (2) years.

(Thiesing Decl., Ex 1 ¶¶ 7, 10.) Paragraph 10 then states as follows:

> 10. If, after termination of my employment with the Company, I obtain other employment but, because of the provisions of this Agreement, my position will be such that my gross monthly income will be less than that which I last received from

the Company as a regular monthly base pay, then the Company's obligation to make payments to me for the period specified in Paragraph 6 will be limited to the difference between the amount I last received from the Company as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.

(Thiesing Decl. Ex. 1 ¶ 10.) According to the defendants, these provisions set forth mutual promises of performance that constitute consideration for the Employment Agreement.

Conversely, the plaintiffs contend that the obligation to pay Thiesing post-employment compensation if he could not obtain employment because of the non-compete provision is qualified by Paragraph 8 of the Employment Agreement, which states the following:

8.     I will, for each month of such unemployment for which I claim payment, give the Company a detailed written account of my efforts to obtain employment, and such account will include a statement by me that although I conscientiously sought employment, I was unable to obtain it solely because of the provisions of this Agreement. I will submit each account within fifteen (15) days following the end of each calendar month of my unemployment, and the Company shall make a payment to me equal to my monthly base pay at termination.

(Thiesing Decl., Ex. 1 ¶ 8.) According to the plaintiffs, the promise to pay Thiesing is indefinite because Paragraph 8 requires him to demonstrate that his efforts to find new employment were "conscientious." The plaintiffs further argue that because the promise to pay is indefinite and illusory, it cannot constitute adequate consideration.

A promise is not rendered insufficient as consideration for a return promise by the fact that the promisor is expressly given some option, or choice between performances, provided that the option is not "wholly unlimited." *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1268 (8th Cir. 1978) (quoting 1A A. Corbin, CONTRACTS § 160 at 61 (2d ed. 1963)). A promise is illusory "when the alleged promisor's option is unlimited, exactly as it would have been had no promissory words been used at all." 2 A. Corbin, Contracts § 6.9 at 284 (Rev. ed. 1995). In other words, the promises must be conditioned on the same event and must be performed together or not at all. *See Modern Controls*, 578 F.2d at 1268.

In support of their position, Dentsply and GAC rely on *Modern Controls*, which involved an employee who signed a confidentiality and non-compete agreement nine weeks after commencing employment. *Id.* at 1266. The covenant not to compete provided that Andreadakis (the employee) would not work for a competitor of Modern Controls, unless it was diversified, for two years after leaving Modern Controls if the competitor produced or developed a product that Andreadakis worked on while employed at Modern Controls. *Id.* The agreement also provided a post-employment compensation provision, which provided that

> if I [Andreadakis] am unable to obtain employment consistent with my abilities and education, solely because of the provisions of this [covenant not to compete], * * * such provisions shall continue to bind me only as long as [Modern Controls] shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation, bonus or employee benefits) for each month of such unemployment.
>
> . . .
>
> [Modern Controls] is obligated to make such payments to me, upon my fulfillment of the conditions set forth above, for 24 consecutive months unless [Modern Controls] gives me written permission to accept available employment, or gives me a written release from the obligations of [the covenant not to compete].

*Id.* at 1268, n.7.

The *Modern Controls* court found that, although Modern Controls had an option to not pay Andreadakis, the option was not "wholly unlimited" because "Andreadakis's promise not to compete for two years and Modern Controls' promise to pay him his base salary for two years are both conditioned on Modern Controls' decision to enforce the covenant and both promises must either be performed together or not at all." *Id.* at 1268. Because Modern Controls was required to release Andreadakis from the covenant or become liable for breach of contract if it refused to pay him post-employment compensation, the court found the covenant to be supported by independent consideration. *See id.*

Thiesing and AO distinguish the present covenant not to compete from the one in *Modern*

16

*Controls*, however, instead comparing it to the restrictive covenant in *FSI Int'l, Inc. v. Shumway*, No. CIV.02-402RHKSRN, 2002 WL 334409 (D. Minn. Feb. 26, 2002). After thirteen years of employment with FSI, Shumway executed an employment agreement with FSI, which contained a confidentiality agreement as well as a covenant not to compete. Specifically, the agreement "required Shumway, both during his employment at FSI and for a period of one year after termination, not to sell, distribute, or lease a "Competing Product," directly or indirectly, to a customer with whom he had communicated during the last two years of his employment with FSI." *Id.* at *1. FSI promised to pay Shumway up to 75% of his average monthly pay for up to one year if he was unable to obtain employment because of the covenant not to compete if Shumway "conscientiously and diligently [sought] other employment." *Id.* at *6. FSI required Shumway to give it a detailed written report for each month of unemployment, describing his efforts to obtain another job, and if FSI determined that Shumway did not conscientiously and diligently seek other employment, it could suspend the monthly payments, which would be considered forfeited. *Id.*

The *Shumway* court found that, unlike the covenant in *Modern Controls*, the covenant was "not based on a simple decision of whether to enforce the restrictive covenants." *Id.* Rather, the promise to pay was based on "subjective standards of sufficient 'diligence' and 'conscientiousness' and provid[ed] no clear guidance for when the right to receive payment" was triggered. *Id.* Characterizing FSI's promise to pay as placing "unfettered discretion" in its own hands, the court found that its promise to pay was not sufficiently definite to be deemed consideration for the restrictive covenant. *Id.*

Here, I find that the post-employment provisions discussing Thiesing's compensation in the event that he could not find employment are more like the employment provisions in *Shumway* than those in *Modern Controls*. Unlike Modern Controls, Dentsply was certainly not unconditionally

bound to pay Thiesing post-employment compensation if it chose to enforce the covenant not to compete against Thiesing. As was the case in *Shumway*, Dentsply conditionally promised to pay Thiesing if he "conscientiously" sought employment, leaving the condition (the determination of whether Thiesing's efforts were conscientious) susceptible to the power and privilege of Dentsply. Had the defendants decided not to pay Thiesing post-employment compensation, Thiesing would have still been obligated to not compete with the defendants. In this respect, Thiesing's promise not to compete for two years and Dentsply's promise to pay him his post-employment compensation are not conditioned on the same event. This runs contrary to the principle that adequate consideration for non-ancillary covenants requires both promises to be performed together or not at all.

That the defendants never rejected former employees' requests for payment because the employees were not making a conscientious effort, and that the defendants, in practice, required only that former employees simply make the effort to obtain employment (not that the effort be a conscientious one) does not change the consideration analysis. Notwithstanding Dentsply's practice, the defendants maintained the option and very well could enforce the language of the Employment Agreement that they drafted.

Notwithstanding the foregoing, a promise is not rendered unenforceable by the fact that part of the consideration for it is invalid. *See* Restatement (Second) of Contracts § 80(2) (1981) ("The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.") In other words, one valid consideration is enough. *See* 2 A. Corbin, Contracts § 5.13 at 62 (Rev. ed. 1995).

Here, consideration for the covenant can be found in Paragraph 10 of the Employment Agreement, which obligates the company to pay the employee the difference between the employee's salary and the salary the employee last received from the company if the Employment Agreement

prevents him or her from securing employment of equal or more pay. Unlike the "promise" in Paragraph 7, the promise to pay contained in Paragraph 10 is limited. Once Thiesing found other employment at a lower rate of pay because of the restrictive covenant, the defendants were obligated to pay Thiesing unconditionally. This was a promise with no strings attached, and therefore, it establishes sufficient consideration to support the enforceability of the contract.

For these reasons, the plaintiffs' motion for summary judgment as to the issue of consideration will be denied.

## C. Enforceability of Covenant Not to Compete.

Restrictive covenants limit one's right to work and to earn a livelihood and are therefore "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Bennett v. Storz Broad. Co.*, 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965). Though disfavored by Minnesota courts, non-competition agreements are enforceable to the extent they serve a legitimate employer interest and are no broader than necessary to protect this interest. *See Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998); *see also Bennett*, 270 Minn. at 534, 134 N.W.2d at 899 (stating that if a court finds the covenant to be necessary, it must consider the reasonableness of the scope, and the covenant must not impose any greater restriction on the employee than is necessary to protect the employer's business). "Legitimate interests that may be protected include the company's goodwill, trade secrets, and confidential information." *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. App. 2001) (citing *Roth v. Gamble-Skogmo, Inc.*, 532 F. Supp. 1029, 1031 (D. Minn. 1982)).

The defendants contend that the non-compete provision protects GAC's goodwill and customer relationships. The plaintiffs do not appear to dispute, and the court finds, that the non-compete provision serves the defendants' legitimate interests. The plaintiffs' main contention is that

the non-compete restrictions extend far beyond what is necessary to protect the defendants' legitimate interests.

In determining whether a non-compete provision imposes a greater restraint on an employee than is reasonably necessary, Minnesota courts have examined the "nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends." *Bennett*, 270 Minn. at 534, 134 N.W.2d at 894. Moreover, under Minnesota law, the "blue-pencil doctrine" allows a court, at its discretion, to modify unreasonable restrictions on competition in employment agreements by enforcing them to the extent reasonable. *See Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n.8 (Minn. 2002) (citing *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n.1 (Minn. 1980)).

Here, the plaintiffs contend that the non-compete provision contained in Paragraph 6 of the Employment Agreement is overly broad, and therefore void and unenforceable, because it is plagued by the following problems: (1) its definition of the term "Company" encompasses Dentsply and all of its twenty-five divisions; (2) the geographic scope of the non-compete agreement is overly broad; and (3) the non-compete agreement is replete with definitions that are ambiguous and indecipherable. Because of the covenant's overbreadth, the plaintiffs argue that the restrictions are not reasonably necessary to protect Dentsply and impose unreasonable restraints on Thiesing's employment opportunities.[5]

### 1. Definition of Company.

The plaintiffs contend that the non-compete extends the post-employment restrictions not

---

[5] The plaintiffs' moving brief by and large applies Wisconsin law. That is, the plaintiffs argue that the non-compete agreement runs afoul of the requirements of Wis. Stat. § 103.465 and the rules of construction applied by Wisconsin courts. Because this court has found that Minnesota, not Wisconsin, law governs the interpretation of the Employment Agreement, the covenant not to compete will be analyzed accordingly.

just to the business of GAC, but to the business of Dentsply and all of its twenty-five divisions. Because the company against which Thiesing cannot compete is not only GAC, but Dentsply and all of its twenty-five divisions, the covenant not to compete goes far beyond that which is necessary to protect GAC, argue the plaintiffs.

Notably, the plaintiffs do not rely on the language contained within the Employment Agreement, and for good reason. According to the Employment Agreement, "'COMPANY' means DENTSPLY International Inc. or any division, subsidiary or affiliate thereof, and their respective successors and assigns." This definition is somewhat imprecise. Nevertheless, the definition uses the term "or" to separate Dentsply and "any division," and therefore, the plain language of the contract language means exactly what it says—that the company against which Thiesing cannot compete is Dentsply or any division, GAC in this case. If "Company" meant Dentsply *and* all twenty-five divisions, it would have said exactly that. Or, the definition could have defined "Company" as "Dentsply International Inc, *including* any division, subsidiary or affiliate thereof" to denote the same. The Employment Agreement does not reflect these definitions, however. Rather, its use of the disjunctive unambiguously restricts Thiesing's covenant not to compete to the division for which he worked.

Although the language of the contract speaks for itself, the plaintiffs, in support of their position, cite to the deposition testimony of senior counsel for Dentsply, Justin McCarthy, II, designated to testify on Dentsply's behalf under Federal Rule Civil Procedure 30(b)(6). Mr. McCarthy testified that the agreement with Mr. Thiesing is "between he and Dentsply International and all divisions." (Duffin Decl., Ex. A at 36-37.) Left out was Mr. McCarthy's later testimony that it is the "company's position as it relates to Tim Thiesing only the company means GAC and only GAC and not the other Dentsply divisions[.]" (Chaet Aff., Ex. H at 83.) At best, Dentsply's

counsel's testimony is equivocal, which provides more reason to focus on the language of the contract when interpreting its application.[6]

Therefore, the covenant not to compete is not overbroad with respect to the definition of the company against which Thiesing is restricted from competing.

**2. Territorial Scope.**

The non-compete provision applies to "geographic areas in which [Thiesing] worked while employed by the Company . . . ." This is not a case where the non-compete provision is wholly lacking in a territorial scope. Even if it was, a covenant lacking a territorial limitation is not "*per se* unenforceable." *See Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn. Ct. App. 1993) (remanding case to the district court to scrutinize the nonemployment covenant, being mindful of the fact that it has discretion to "blue pencil" a covenant).

According to the plaintiffs, the territorial scope is overbroad because the provision contains no limitation on how long an employee must have worked in a certain geographic area for it to be off limits, nor does it contain any limitation with respect to how recently the employee must have worked in a particular geographic area for it to be off limits after his employment with Dentsply ends.

The geographic scope of the covenant not to compete here is similar to the scope of the covenant in *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698 (Minn. Ct. App. 1989), where the covenant not to compete prohibited the former employee from soliciting any business from customers personally serviced while employed and from competing with the former company in any territory in which the appellant worked. *Id.* at 700. The former employee challenged the breadth of

---

[6] Although Thiesing sold products for two other divisions of Dentsply, the court finds no inconsistency with the defendants' decision to not enforce the Employment Agreement with respect to some divisions, on the one hand, and to seek enforcement of the Employment Agreement with respect to another division, on the other hand.

the covenant on the grounds that the geographical scope included more than just the territory assigned to him; he argued that it included "any territory in which [he] may have worked." *Id.* at 703. Finding that the geographical scope of the covenant was limited to the areas in which the former employee actually worked, the court found the restriction was "not overbroad when examined in light of its purpose." *Id.*

*Overholt* illustrates that a geographical restriction that is limited to areas in which the former employee worked is generally held to be reasonable under Minnesota law. In other words, in the absence of language regarding length and recency of employment in *Overholt*, the Minnesota court still found the scope of the non-compete clause reasonable when limited to territories in which the former employee actually worked. Here, Thiesing's territory while working for GAC included Minnesota, parts of Wisconsin, North Dakota, and South Dakota. Because his agreement restricts employment "in geographic areas in which [he] worked while employed by the Company," the scope of the restriction withstands scrutiny under Minnesota's reasonableness standards.

Nevertheless, were the court to find the scope of the non-compete provision at issue in this case too broad, the plaintiffs argue that blue-penciling does not remedy the non-compete covenant because the doctrine does not allow the court to rewrite a new contract for the parties. To be sufficiently limited in scope, the plaintiffs argue that it would be necessary to add limiting language after "geographic areas in which I worked," such as "during the last two years of employment with the Company." The case cited by the plaintiffs, however, *Bess v. Bothman*, 257 N.W.2d 791 (Minn. 1977), does not save the day for them. To be sure, the *Bess* court stated that the "rationale of the blue pencil doctrine is that a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties." *Id.* at 794 (citing 6A Corbin, Contracts, § 1390). Nevertheless, in the end, the *Bess* court affirmed the district court's modification of a restrictive

covenant that lacked both a territorial and a temporal limitation—a modification that *inserted* a particular geographic location (Forest Lake) as well as a time limitation (five years). *See id.* at 793-94. The Minnesota Supreme Court found this to be within the court's authority to modify and enforce the covenant not to compete. *See id.* at 795.

Similarly, in *Vital Images, Inc. v. Martel*, Civil No. 07-4195, 2007 WL 3095378 (D. Minn. Oct. 19, 2007), the covenant not to compete did not contain a territorial limitation. Instead, the covenant was restricted by product in that it restricted the employee from distributing or marketing competing products or providing services for any entity that is developing or marketing competing products. *Id.* at *3-4. The court, applying Minnesota law, concluded that it was reasonable to modify the scope of the non-compete provision so that it was geographically limited to those states in which the former employee worked, and it enforced the provision as modified. *Id.* at 4.

Following the reasoning of *Bess* and *Vital Images*, it would still be within this court's authority to enforce Thiesing's covenant not to compete in the territories he actually worked for under GAC. Therefore, summary judgment on the claim that the covenant not to compete is overbroad with respect to the territorial scope will be denied.

### 3. Definitions of Terms.

Finally, the plaintiffs contend that the way in which terms used throughout the Employment Agreement are defined results in a non-compete agreement that is overbroad and indecipherable. Specifically, the plaintiffs argue that (1) defining "Conflicting Product" as any product or service that "resembles or competes" with any product manufactured or distributed by Dentsply results in too broad of a prohibition because products may resemble those of Dentsply but not compete with the same, and (2) there is a problem of "access to" versus actual "knowledge of" associated with the definition of "Confidential Information" that renders the non-compete provision indecipherable. The

court will address each argument in turn.

**"Conflicting Product"**

Here, the defendants have a legitimate interest in protecting themselves "against 'the deflection of trade or customers by the employee by means of the opportunity which the employment has given him.'" *Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988) (quoting *Bennett v. Storz Broad. Co.*, 207 Minn. 525, 533, 134 N.W.2d 892, 898 (1965)). Covenants in employment contracts are also upheld when designed "to protect the legitimate interest of the business or professional man about to employ another under circumstances where the employee is given access to the employer's patronage, customers, clients, or trade secrets." *Bennett*, 207 Minn. at 533, 134 N.W.2d at 898. The evidence demonstrates that Thiesing's relationship with GAC customers was sufficiently close to give the defendants a legitimate interest in protecting itself against Thiesing's solicitation of those customers.

With respect to the definition of "Conflicting Product," it may be that certain products resemble, but do not compete, with a product manufactured or distributed by Dentsply. In the plaintiffs' example, vampire teeth worn with a Halloween costume or a dental-themed toy given to a child may fall into this category. The defendants have not demonstrated why including such products that resemble, but do not compete, within the definition of "Conflicting Product" is reasonably necessary to protect their legitimate interests. In fact, the defendants equated the term "resemble" with functionality. In other words, the defendants indicated that the non-compete provision was intended to cover products that performed similar functions to products manufactured or distributed by Dentsply, and therefore, competed with Dentsply. If a product resembled one of Dentsply's products, but did not compete with it, Dentsply represented that it would not be subject to enforcement. (Duffin Decl., Ex. A at 78-80.) Despite the defendants' representations, under its

25

draftsmanship, a conflicting product could be construed to include vampire teeth and dental-themed toys, and is thus, overly broad.

Nonetheless, the defendants liken their definition of "Conflicting Product" to the definition of conflicting product in *Minnesota Mining and Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 328, 335 (D. Minn. 1980), which was upheld by the court as reasonable. In *Minnesota Mining and Mfg. Co.*, "conflicting product" was defined as "any product or process of any person or organization other than 3M, in existence or under development, which *resembles or competes* with a product or process upon which I work . . ., or about which I acquire CONFIDENTIAL INFORMATION through my work with 3M." *Id.* at 328 (emphasis added). Although the definition of "conflicting product" with respect to "resembles or competes" was not directly challenged, the court did not find any of the restrictions broader than necessary to protect the employer's legitimate need to protect its confidential information. *Id.* at 335. To be sure, the former employee, a chemist, had unbridled access to the research and development methods and manner of designing 3M's core product, giving 3M a legitimate interest in seeing that its confidential information was not used to create a product for a different corporation that resembled a product of its own. Because the former employee was hired by a competitor to assist in the development of magnetic media, it was more likely that 3M could protect its interest by including within the definition of conflicting product, products that "resembled or competed" with a 3M product. As previously discussed, Dentsply and GAC have not identified a similar reason demonstrating why such a restriction is necessary to protect their interest against the deflection of trade or customers.

Although the inclusion of products that "resemble" those manufactured or distributed by the defendants is more broad than what is reasonably necessary to protect itself against Thiesing's solicitation of its customers, the court finds that it is reasonable to modify the scope of the definition

of "Conflicting Product" under the blue pencil doctrine so that it is limited to only products that compete with any product manufactured or distributed by the defendants. After eliminating the term "resembles," the court finds the restraint reasonable and not an unnecessary hardship on Thiesing's livelihood. Under Minnesota law, the non-compete provision concerning the definition of "Conflicting Product," is enforceable as modified.

**"Confidential Information"**

Next, according to the plaintiffs, the way in which "Confidential Information" and "Conflicting Product" are defined creates an inconsistency. "Confidential Information is defined as "information disclosed to me or known or acquired by me as a result of my employment by the Company." Within the definition of "Conflicting Product,"competition is prohibited with respect to "any product manufactured, distributed or under development by the Company incorporating CONFIDENTIAL INFORMATION *to which I had access* during my term of employment with the Company, or whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION *to which I shall have had access* during my employment by the Company." (emphasis added). According to the plaintiffs, this "access to" versus actual "knowledge of" the "Confidential Information" creates ambiguity and therefore renders the non-compete provision unenforceable.

As written, the court agrees with the plaintiffs' statement that the definitions of "Conflicting Product" and "Confidential Information" leave an employee unsure about what is prohibited and what is not. Having access to information is certainly different than knowing information by virtue of either disclosure or acquisition, and thus, attaching both qualifications to the definition creates confusion. Therefore, the court is not convinced that the scope of the non-compete with respect to the description of "Confidential Information" is reasonable.

27

However, under Minnesota law, the Employment Agreement can be easily modified by simply striking certain language so as to clarify the agreement, thus making it reasonable. Using the blue pencil doctrine, the court concludes that it is reasonable to strike from the definition of "Conflicting Product" the words following the first use of "CONFIDENTIAL INFORMATION," which state "to which I had access during my term of employment with the Company," as well as the words following the second use of "CONFIDENTIAL INFORMATION," which state "to which I shall have had access during my employment by the Company." What results is an agreement that unambiguously refers to confidential information as certain information that was disclosed or acquired. The non-compete provision is therefore enforceable as modified.

The court is mindful of the limitations the covenant not to compete places on Thiesing's right to work and earn a livelihood. The free movement and personal liberty of employees, however, must be balanced against the right of an employer to protect himself from unfair competition. As was recognized in *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 160 N.W.2d 566 (1968), when it comes to business executives and professional employees, the "interest to be protected is more substantial . . . ." *Id.* at 20 n.8, 160 N.W.2d at 571 n.8. Here, the defendants provided Thiesing with the opportunity to form strong customer relationships, and the defendants have a legitimate interest in protecting its goodwill and customer relationships. In balancing the competing interests of the employee and employer, the court finds that to the extent that the covenant to compete is modified and enforced, it does not impose an unnecessary hardship on Thiesing's livelihood.

Furthermore, because the non-compete agreement is enforceable as modified, the plaintiffs' argument that the defendants' counterclaims should be dismissed by virtue of being predicated on an unenforceable contract fails.

**D. Breach of Contract Claim.**

Count I of the defendants' counterclaims alleges breach of contract. Having established the enforceability of Thiesing's Employment Agreement, the defendants contend that Thiesing breached his Employment Agreement. According to the plaintiffs, the defendants have failed to show that AO sells a "Conflicting Product" as the term is defined in the Employment Agreement and therefore are not entitled to summary judgment on this claim.

It is undisputed that AO and GAC directly compete against one another, particularly with respect to brackets, metal brackets, tubes, bands, and some adhesives and elastometrics. (DPFOF ¶ 10.) It is also undisputed that Thiesing is now contacting and soliciting his old GAC customers, and that he has sold products for AO, including metal brackets, some self-ligating brackets, cosmetic brackets, some tubes, bands, adhesives, elastomeric wires, instruments and mini-screws, to over seventy customers that he sold products to while employed by GAC. (DPFOF ¶¶ 84-85, 87.) In addition, Thiesing now sells the same product lines for AO that he sold when at GAC. (DPFOF ¶ 84.)

The court is in agreement with the plaintiffs that it cannot be said that AO and GAC are "Conflicting Organizations" merely because they both sell orthodontic products. Rather, AO must market or sell a "Conflicting Product," meaning a product that competes with any product manufactured or distributed by GAC incorporating confidential information. Absent from the undisputed evidence is whether any products sold and manufactured by the defendants that compete with products sold and manufactured by AO incorporate confidential information, which is a prerequisite to any finding that AO sells a conflicting product, which is another prerequisite to proving that AO is a conflicting organization. Also missing from the evidence is whether such confidential information was disclosed to Thiesing or known or acquired by Thiesing. Simply put,

there is no evidence regarding which GAC products incorporated confidential information, and there is no evidence specific to Thiesing's knowledge of confidential information that provides the final link to establishing a breach of contract. General allegations are not sufficient, and thus, the court cannot say that Thiesing breached his Employment Agreement.

Therefore, the defendants have not demonstrated that they are entitled to judgment as a matter of law on their breach of contract counterclaim. Furthermore, this finding prevents the court from issuing an order enjoining Thiesing from continuing to breach his Employment Agreement.

## E. Tortious Interference With Contract Claim.

Count III of the defendants' counterclaims alleges tortious interference with contracts against AO for interfering with the Employment Agreement. Under Minnesota law, a cause of action for tortious interference with a contractual relationship requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (quoting *Furley Sales and Assoc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)). First, because the court determined that the defendants have not shown that Thiesing breached his Employment Agreement, to say that AO procured a breach of Thiesing's Employment Agreement would be premature.

However, even if the court were to find that Thiesing breached his Employment Agreement as a matter of law, the defendants would still not prevail on their tortious interference with contract counterclaim. The first two elements have been satisfied in that, as previously discussed, an enforceable contract between Thiesing and GAC existed, and it is undisputed that the plaintiffs possessed knowledge of said contract prior to offering Thiesing employment. Nevertheless, the element that prevents the defendants from prevailing on this counterclaim is the fourth element.

Putting aside the third requirement—that the breach of contract be intentionally procured—there is no tortious interference when sufficient justification exists for the interference. *See id.* Justification exists "where one asserts 'in good faith a legally protected interest of his own * * * believing that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.'" *Id.* (quoting Restatement (Second) of Torts § 773 (1979)). The defendants possess the burden of proving justification; however, the issue of justification is usually an issue of fact, with the test being what is reasonable conduct under the circumstances. *See id.* (citing *Bennett v. Storz Broad. Co.*, 270 Minn. 525, 537, 134 N.W.2d 892, 900 (1965)). Because the element of justification is generally an issue of fact, it cannot be said that AO tortiously interfered with the Employment Agreement as a matter of law.

Thus, the defendants' motion for summary judgment with respect to their tortious interference counterclaim will be denied.

## F. Tortious Inteference With Prospective Contractual Relations.

The defendants allege that Thiesing and AO tortiously interfered with GAC's prospective business expectancy and relations by wrongfully and improperly soliciting GAC's established prior business relationships. Tortious interference with prospective contractual relations requires that the alleged wrongdoer do so intentionally and improperly. *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1982). Intentional and improper interference with existing or prospective contractual relationships includes interference by (1) "inducing or otherwise causing a third person not to enter into or continue the prospective relation"; or (2) "preventing the other from acquiring or continuing the prospective relation." *See id.* at 633.

The plaintiffs contend that they are permitted to compete with the defendants so long as they do not do so improperly. While the premise that competition is not an improper interference with

prospective contractual obligations is true, any interference on the part of the AO is not per se justified by the mere fact of competition alone because Thiesing and GAC were parties to an enforceable covenant not to compete. *See* Restatement (Second) of Torts § 768 cmt. h ("[W]hen B is legally obligated to deal with C, A is not justified by the mere fact of competition in inducing B to commit a breach of his legal duty.") Here, therefore, competition may be only one factor in determining whether any interference was improper.

In examining whether Thiesing and AO prevented GAC from acquiring or continuing the prospective relationship with its customers, the court finds that the evidence relied upon by the defendants is insufficient to grant them summary judgment. First, the mere existence of a covenant not to compete and AO's knowledge of that covenant is not enough in and of itself to prove improper interference. Furthermore, the defendants' remaining evidence that falls within the ambit of Kores' affidavit is inadmissible hearsay. In his affidavit, Kores claims that, through his conversations with some of the orthodontists, the orthodontists told Kores about certain negative comments Thiesing made about GAC. These statements, seemingly being offered to prove the truth of the matter asserted, and in turn, to demonstrate improper interference, constitute hearsay. Pursuant to Fed. R. Civ. P. 56(e), supporting and opposing affidavits must be made on personal knowledge and set out facts that would be admissible in evidence at trial. Thus, inadmissible hearsay is not competent summary judgment evidence. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Moreover, the defendants have made no attempt to identify whether and which hearsay exceptions would permit the admissibility of their proffered evidence, and the court will not undertake this task for them.

The defendants offer no other evidence to support their contention that the interference with GAC's prospective contractual relations is improper. Therefore, the defendants have not

32

demonstrated that Thiesing and AO tortiously interfered with GAC's prospective contractual relations as a matter of law. The defendants' motion for summary judgment with respect to said counterclaim will therefore be denied.

NOW THEREFORE IT IS ORDERED that the plaintiffs' motion for summary judgment be and hereby is **DENIED**;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment be and hereby is **DENIED**;

IT IS FURTHER ORDERED that a conference with the parties to discuss the further processing of this case to final resolution and judgment will be conducted on October 25, 2010 at 9:00 a.m. in Courtroom 242, United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

SO ORDERED this 28th day of September 2010 at Milwaukee, Wisconsin.

BY THE COURT:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge