UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY THIESING and AMERICAN
ORTHODONTICS CORPORATION,

        Plaintiffs and Counterclaim Defendants,

        v.                            Case No. 09-C-359

DENTSPLY INTERNATIONAL, INC. and
GAC INTERNATIONAL, LLC, a division of
DENTSPLY INTERNATIONAL, LLC,

        Defendants and Counterclaim Plaintiffs.

## DECISION AND ORDER FOLLOWING BENCH TRIAL

## I. INTRODUCTION

This case was commenced by the plaintiffs, Timothy M. Thiesing ("Thiesing") and American

Orthodontics Corporation ("AO"), against defendants Dentsply International, Inc. ("Dentsply") and

GAC International, LLC ("GAC"), a division of Denstply International, Inc., seeking an order from

this court finding that a non-compete agreement that Thiesing signed while he was working as a

salesman for GAC was not enforceable. Once they were served, the defendants filed an answer and

counterclaim seeking damages from Thiesing for breach of the non-compete agreement and from AO

for tortious interference with contract.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, diversity of

citizenship. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a)(3)

because the defendant is subject to personal jurisdiction in this district.

This case was assigned according to the random assignment of civil cases pursuant to 28

U.S.C. § 636(b)(1)(B) and General Local Rule 72(a) (E.D. Wis.). The parties have consented to

United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

No doubt much to the disappointment of the parties, on September 28, 2010, the court issued a decision denying both parties' respective motions for summary judgment. In that decision the court found that the non-compete agreement, as modified by the court, was enforceable. Such modification, i.e., "blue lining," is allowed by Minnesota law, which the court determined was applicable to the case. At the same time, the court denied the defendants' motion for summary judgment, finding that there were material issues of fact that needed to be decided at trial.

And so, from July 11, 2011 through July 15, 2011, a court trial was conducted in this action. Because the court previously ruled on summary judgment that the non-compete agreement was enforceable, as modified, the only issues to be resolved at trial were (1) whether Thiesing breached the non-compete agreement; (2) whether AO tortiously interfered with the contract (the non-compete agreement) between Thiesing and GAC; and (3) what damages, if any, did GAC sustain as a proximate result of either, or both, of these claims.

Eleven witnesses testified at the trial: the plaintiff, Timothy Thiesing ("Thiesing"), Mike Harvel ("Harvel"), Marc Katz ("Katz"), Lee Tuneberg ("Tuneberg"), Todd Remmel ("Remmel"), Maureen Herbst ("Herbst"), Robert Miller ("Miller"), Tracy Luczak ("Luczak"), Doreen Gebhardt ("Gebhardt"), Scott Wildman ("Wildman"), and Michael Bogenschuetz ("Bogenschuetz").

The parties were thereafter afforded an opportunity to submit written memoranda in support of their respective positions on the defendants' claims. Having now fully considered the testimony, the exhibits, and the submissions of the parties, the court issues its decision on the defendants' claims. This decision shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

## II.  FACTUAL BACKGROUND

As stated previously, on September 28, 2010, the court held Thiesing's Employment Agreement to be enforceable as modified under Minnesota's blue-pencil doctrine.  However, the defendants failed to prove that Thiesing violated his non-compete agreement as a matter of law at that time, culminating in a trial on the breach of contract and tortious interference claims.

The facts in this case are relatively straightforward.  From 2001 until March 19, 2009, Thiesing worked as a successful sales representative at GAC, a subsidiary of Dentsply.[1]  Dentsply, a Delaware corporation headquartered in York, Pennsylvania, is the largest manufacturer of dental prosthetics and consumable dental products in the world.

GAC manufactures and sells orthodontic supplies and products through a network of sales representatives.  As one of GAC's sales representative, Thiesing sold GAC products in a territory that consisted of Minnesota, North Dakota, South Dakota, and parts of Wisconsin.  Thiesing's territory, while employed at GAC, contained approximately 250-275 orthodontists.

At the time he joined GAC, Thiesing did not sign an Employment Agreement.  However, in early 2004, at an annual meeting of all GAC sales representatives in Dallas, Texas, all GAC sales representatives were presented with a Dentsply International, Inc. Employment Agreement to sign.  Thiesing signed the Employment Agreement while at the national sales meeting.  Included within this agreement was a post-employment restrictive covenant, which, with its numerous definitions, has become the lynchpin of this case in the wake Thiesing's employment with AO.

There are only a handful—four or five—top suppliers of orthodontic products, including AO and GAC.  There are roughly 8,000 orthodontists in the United States, most of whom belong to an

---

[1] Thiesing generated approximately $3 million in annual sales in 2008, increasing his total sales by about 15% each year.

3

association known as the American Association of Orthodontists ("AAO"), which publishes a directory listing all of its members. Many orthodontists also advertise in the yellow pages. Most orthodontists buy their orthodontic supplies from more than one supplier.

Upon starting his position with GAC, Thiesing received extensive training and was provided a list of customers who had purchased products from GAC, along with the AAO directory and a copy of GAC's retail price list. That said, it is standard practice in the orthodontic industry for sales representatives to sell products at 50 percent off of the retail list price; GAC sales representatives need permission to offer a greater discount.

However, a group of orthodontists in the United States and Canada joined together for the purpose of obtaining volume discounts on orthodontic supplies, forming the United Orthodontic Buying Group ("UOBG"). Subsequently, UOBG entered into an agreement with GAC to be the exclusive provider of orthodontic supplies to its members.

As of June 2008, UOBG is owned and operated by GAC. Members of UOBG receive an additional discount beyond the standard 50 percent discount off retail price in exchange for agreeing to purchase all of their "core" products (i.e., brackets and bands) from GAC. Accordingly, GAC has a UOBG price list, copies of which it provides to its sales representatives. GAC's sales representatives have provided copies of the UOBG price lists to both UOBG members and to nonmembers.

Additionally, GAC sales representatives receive information regarding the purchasing history of the accounts, a three-year snapshot of each particular account by product class, part number, and account number, as well as marketing information, sales sheets, newsletters, and some advertising. GAC sales representatives also receive information on the architecture of GAC's products and product design.

4

In 2006, GAC's president died of cancer and a new management team took over. Problems thereafter began to surface with the GAC operation. For example, there were more numerous delays in the delivery of product to customers. There also arose problems in the customer service department.

GAC sales representatives, including Thiesing, complained to GAC about the poor service being given to customers by the customer service department. For example, the customers were being given inaccurate information and were not being responded to in timely fashion. Moreover, orders were being "lost" in GAC's new computer system, and customers were not being made aware of the fact that their orders had been lost until they would call to inquire about the status of their order.

Indeed, the problems became so pronounced that GAC Rocky Mountain Regional Manager Mike Harvel told sales representatives who reported to him, including Thiesing, that they should "have a back-up plan."

In the wake of these circumstances, in January 2009, Thiesing began to explore other employment opportunities outside of GAC. On January 23, 2009, Thiesing contacted Mike Haskett and Lee Tuneberg, Executive Vice President of AO, regarding his interest in partnering with AO. On February 13, 2009, Thiesing met with Remmel, the Director of Sales for AO, Bogenschuetz, the President of AO, and Tuneberg in Sheboygan, Wisconsin. At this meeting, they discussed, among other things, the orthodontic industry generally. Before attending the February 13, 2009 meeting, Thiesing sent AO his resume and Employment Agreement. Bogenschuetz directed Tuneberg to review the agreement and consult legal counsel if necessary.

Sometime around mid-March 2009, Remmel telephoned Thiesing to offer him employment with AO. On March 12, 2009, Thiesing received an e-mail message from the Director of Human

5

Resources for AO, welcoming him to AO's sales team and providing him with information regarding pre-employment requirements and documentation. On March 11, 2009, Thiesing sent his two-week notice of resignation to GAC representatives. However, Thiesing was terminated from GAC effective March 19, 2009, immediately upon GAC and Dentsply learning of Thiesing's employment with AO.

Thiesing began employment with AO on April 1, 2009. AO, like Denstply, manufactures brackets, bands, wires, and related products used by orthodontists and other dental professionals. Upon commencing his employment with AO, Thiesing was assigned a territory that was roughly the same as he had when he was working for GAC, although he was also assigned responsibility for the state of Iowa. Although AO was also considering dividing territory in other regions of the United States, including New Jersey/Pennsylvania, Chicago, and northern California, it nevertheless created for Thiesing and assigned to him the territory with which he was most familiar.

Thiesing does not dispute that, as a sales representative for AO, he has solicited many of the same orthodontists who were customers of GAC and that he has sold to them products that resemble GAC's products. As of December 2010, Thiesing sold AO products to approximately 75 customers to whom he had previously sold GAC products.

GAC did not hire a replacement for Thiesing until August 17, 2009, when Peter Kores ("Kores") joined GAC. Kores did not have any prior experience selling orthodontic products, and approximately one year later he left the employ of GAC. To replace Kores, GAC hired another individual with no prior experience in the orthodontic industry.

6

### III. DISCUSSION

As previously stated, Thiesing signed an Employment Agreement on January 14, 2004, while at a company meeting in Dallas, Texas. The Employment Agreement contains a post-employment restrictive covenant, which reads as follows:

> 6. I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION or, in the event I am a sales representative, I will not work for CONFLICTING ORGANIZATION in geographic areas in which I worked while employed by the Company, for a period of two (2) years after termination of my employment with the Company, except that I may accept employment with a CONFLICTING ORGANIZATION, whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the Company, prior to my accepting such employment shall receive separate written assurances satisfactory to the Company from such CONFLICTING ORGANIZATION and from me, that I will not render services, directly or indirectly, in connection with any CONFLICTING PRODUCT.

(Ex. 1000.)

There is no dispute that AO and GAC are competitors, thereby satisfying the definition of "conflicting organization," as that term is defined in the Employment Agreement. What survived of the definition of "conflicting product" after applying Minnesota's blue pencil doctrine is as follows:

> "CONFLICTING PRODUCT" means any product, process, machine, material or service in existence or under development, of any person or organization other than the Company, which resembles or competes with any product manufactured, distributed or under development by the Company incorporating CONFIDENTIAL INFORMATION, or whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION.

(Ex. 1000.) Because there is no dispute that at least some of AO's orthodontic products resemble or compete with the orthodontic products of AO, whether Thiesing breached his non-compete agreement hinges on whether any "confidential information" was disclosed to Thiesing or acquired by Thiesing as a result of his employment with GAC. "Confidential information," in turn, is defined as follows:

7

"CONFIDENTIAL INFORMATION" means information disclosed to me or known or acquired by me as a result of my employment by the Company, not generally known in the trade or industry in which the Company is engaged, about the Company's products, processes, machines, materials and services, including research, planning, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling and the names of existing or future customers, clients and accounts of the Company as well as the needs and requirements of said customers.

(Ex. 1000.)

The court will make an effort to cut-and-paste and then integrate the various definitions set forth in the Employment Agreement and, so integrated, apply them to the instant case.[2] Boiling the language of the Employment Agreement down to its relevant essential components leads to the following statement of what the defendants had to prove in this case: In order for the defendants to prove that Thiesing breached his non-compete agreement they had to show that, as a result of his employment with GAC, there had been disclosed to Thiesing or known or acquired by him, information that was not generally known in the orthodontic trade or industry, about GAC's products, materials and services, including marketing, merchandising, selling and the names of existing or future customers, clients and accounts of GAC as well as the needs and requirements of said customers; and, that the marketability of any GAC product could be enhanced by application of such information to it.

That said, under Minnesota law, in order for information to be confidential, the following four factors must apply to such information: "(1) the protected matter is not generally known or readily ascertainable, (2) it provides a demonstrable competitive advantage, (3) it was gained at expense to the employer, and (4) it is such that the employer intended to keep it confidential." *Cherne Indus.,*

---

[2] The testimony at trial revealed that the Employment Agreement signed by Thiesing was also signed by every other employee of Dentsply, from salespeople to those working in the warehouse. In other words, rather than fashioning different agreements to fit the type of work being performed by the employees signing them, Dentsply crafted a "one-size-fits-all" agreement.

8

*Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 90 (Minn. 1979).[3] *See also Alpine Glass, Inc. v. Adams*, Nos. C4-05-804, C5-02-1010, 2002 WL 31819910, at *5 (Minn. Ct. App. Dec. 17, 2002) (analyzing the four factors as they relate to information sought to be protected as confidential in a non-compete case). Minnesota law recognizes that "matters of general knowledge within the industry may not be classified as . . . confidential information entitled to protection." *Cherne*, 278 N.W.2d at 90 (quotation omitted).

At trial, GAC maintained that the following information is "confidential," as that term is defined in the Employment Agreement: (1) price lists; (2) purchasing history, including product types, frequency, and quantity (i.e., buying habits of the customers); (3) architecture/designs of orthodontic products (angulation and torque information); (4) contact names and schedules of individuals at the various orthodontic offices; and (5) the names of existing or future customers, clients, and GAC accounts. For the reasons that follow, I am not persuaded that these items are "confidential information."

## A. Price Lists

The defendants argue that their price list was confidential information disclosed to, known by, or acquired by Thiesing and such information regarding pricing could enhance the use or marketability of AO's products. It is undisputed that Thiesing had access to three different price lists: the UOBG price list, the non-UOBG price list, and the retail price list.

First, the defendants' UOBG price list was widely distributed to orthodontists across the nation and readily available in the orthodontic industry. Thiesing and Herbst testified to distributing

---

[3] The defendants argue that it is sufficient that information is not generally known in the industry in order to render it potentially confidential. However, the *Cherne* decision makes clear that under Minnesota law whether information is readily ascertainable is also a factor to consider in assessing whether such information is confidential.

UOBG price lists to their customers and to potential customers, even to the point of leaving such price information behind so that the orthodontist could then compare the defendants' prices with those of competitors. Sales representatives would provide the UOBG price list to UOBG members with no obligation to return it or promise to maintain its confidentiality.

Within the orthodontic supply industry itself, handouts comparing the defendants' prices with those of AO were passed around, not only within the sales force at Denstply/GAC, but also at AO. Because of the frequent dissemination of the UOBG price list, such list can hardly be characterized as information "not generally known in the trade or industry in which the Company is engaged."

Second, the defendants have not proven that non-UOBG price lists were any more "confidential" than the UOBG price lists. To what extent the defendants' customer base paid non-UOBG prices up until the point of Thiesing's termination is unclear. Indeed, until very recently, the defendants permitted many orthodontists who did not meet the buying quota of the UOBG to remain UOBG members and receive UOBG pricing. What is clear, however, is that orthodontists received non-UOBG pricing in addition to UOBG pricing, making such information "generally known in the trade or industry in which the Company is engaged."

Finally, the defendants have not established that the retail price list constitutes "confidential information." To the contrary, the evidence demonstrated that GAC's sales representatives regularly provide this list to customers and to prospective customers as well. Because this information is freely distributed, the retail price list is not a mystery to those in the orthodontic industry.

Moreover, the testimony demonstrated that the retail prices are rarely, if ever, used to make quotes to customers, and that this practice is standard across the entire industry. Because sales representatives and supply companies rarely, if ever, use the retail price listing, the defendants have failed to illustrate how the acquisition of such information could enhance the use or marketability of

10

AO products. Indeed, that the retail prices are rarely, if ever, used to make quotes to customers would also render such price lists not confidential under *Cherne* for the simple reason that such lists would not provide "a demonstrable competitive advantage" to a GAC employee.

To be sure, although the defendants presented testimony, largely by way of Harvel, that their price lists were "confidential," the evidence demonstrated otherwise. It appears that each orthodontic supply company was well aware of, not only who its tough competitors were, but also what that competitor company was charging for its products. Thus, the defendants have failed to persuade me that their price lists were "confidential information."

**B. Purchasing History/Customers' Buying Habits**

A second category of information that the defendants argue is "confidential," as that term is defined in the Employment Agreement, is information regarding the purchasing history of customers, i.e., customers' buying habits. This information includes what each customer purchased in the past, the number of units purchased, and how often a customer purchased products. Katz testified that this information can help from a growth pattern standpoint; that is to say, it can help forecast the sales potential for a particular orthodontist. Katz also testified that it could help Thiesing formulate a sales plan before stepping foot into each orthodontist's office.

In my opinion, the defendants have failed to prove that information concerning what a customer bought, how much of it he or she bought, and how often he or she bought from the defendants constitutes "confidential information."

First, with respect to the products that an orthodontist purchased from GAC, it is reasonable to infer that this was far from being "not generally known" within the industry. What products an orthodontist uses and therefore purchases is not a secret. Testimony that the orthodontists generally bought products from various supply companies at any given time went undisputed. The name of

11

the company from which an orthodontist bought products could easily be observed by stepping foot in the doctor's supply room, which contains products that often display company labels. If the name of the company from which an orthodontist bought products was not readily apparent, all a sales representative had to do was ask the orthodontist, who would tell the representative because such information was not secret. Indeed, the orthodontist was more than willing to tell the representative the name of the company from which he or she purchased products. The bottom line is that, because the industry is small, and because of the cross-buying patterns of orthodontists, it is likely that a sales representative would know that an orthodontist is, for example, purchasing brackets from a competitor if the doctor is not buying brackets from the representative's company.

Second, with respect to the number of units an orthodontist buys, such information, if not already known to the various supply company representatives, can be easily ascertained either through observation or by merely asking the orthodontist. Because of the cross-buying patterns of orthodontists, it is likely a sales representative selling brackets to an orthodontist generally knows how many tubes that orthodontist is purchasing from a competitor. If this information is not already known, it can be easily ascertained. As Tuneberg testified, sales representatives get a feel for how big (or small) an orthodontist's practice may be just by stepping inside the office. Upon visiting the orthodontist's office, the sales representative would be able to observe how large it is and how much support staff is present. Knowing an orthodontist's case load per year can also give a sales representative insight about the orthodontist's needs because the product-to-tooth ratio can easily be computed. If a sales representative wanted to know the *precise* number of units each orthodontist was buying, all he has to do was ask. The testimony demonstrates that this information was freely given.

Third, just as information about the quantity of products that an orthodontist was purchasing could be easily ascertained, so too could the frequency of such purchases be easily ascertained. The frequency with which an orthodontist buys products depends on the size of his or her practice, which as explained above, is not a mystery. Therefore, the defendants have not proven that how often an orthodontist buys products from GAC is "confidential information."

No doubt, it is advantageous for supply companies to know what products their competitors are selling and which of those products orthodontists are buying. But the bottom line is that, if such information was not known to sales representatives outside of GAC, it was certainly readily available. With there being only a handful of orthodontic supply companies competing for the business of roughly 8,000 orthodontists, sales representatives know (or can easily ascertain) what the buying scene looks like.

Moreover, it can hardly be said that GAC kept (or intended to keep) information concerning customers' buying habits confidential. For instance, Harvel emailed Thiesing a list of customers who were UOBG noncompliant. (Ex. 1017.) The list included information such as the orthodontists' names as well as their account numbers, bracket sales quantity, and tube sales quantity. Also included within such list were customers *outside* of Thiesing's territory. Thiesing's Employment Agreement only prohibited him from working in geographic areas in which he worked while employed by GAC. He was not prohibited from taking such information and using it to solicit business from accounts outside of his old GAC territory upon going to work for any conflicting organization immediately upon leaving GAC.[4] Such evidence does not demonstrate that GAC wished to keep information about its customers' purchasing history confidential. To the contrary,

---

[4] That the email was marked with an automatically generated "confidential information" warning, and that it is stamped "CONFIDENTIAL ATTORNEY'S EYES ONLY" makes no difference.

such evidence suggests that GAC did not particularly "intend[] to keep it confidential." *See Cherne*, 278 N.W.2d at 90.

Simply stated, the purchasing habits of orthodontists are predictable, likely known in the orthodontic supply industry because of the cross-buying patterns of orthodontists, and freely given to those who ask, thus placing such information outside of the realm of "confidential information." As was freely acknowledged by the witnesses, the customer relationship is one of the most important elements of success, and this means that face time with orthodontists and staff is crucial. In-person visits to an orthodontic office affords sales representatives the opportunity to gather information about the types of products being purchased, the number of units being purchased, and the frequency of purchases being made by the orthodontist through mere observation and the posing of good questions.

In sum, the defendants have failed to prove that information about GAC's customers' purchasing history, including product types, frequency, and quantity (i.e., buying habits of the customers) disclosed to Thiesing or acquired by Thiesing is "confidential information."

## C. Architecture/Design

Harvel testified that the design of GAC's products is confidential because each product has different angulations and torques. GAC is constantly striving to make their products better and more innovative, and therefore, it has a protected interest in keeping information regarding the design of its products from its competitors.

Thiesing testified that, as an employee of GAC, he attended training sessions and trade shows, during which he learned information about the architecture and design of GAC's products so that he might be a better salesman. However, Thiesing also indicated that, whenever possible, he and his colleagues would learn and share information about the architecture and design of their competitors'

14

products, as well. Thiesing indicated that it is important to know how the design of a competitors' product compares to the design of a product he is selling, particularly because it better equips him to field questions from a potential customer and thereby increase his sales.

After considering the limited testimony regarding the architecture and design of orthodontic products, I conclude that this information is not "confidential" for purposes of the Employment Agreement. Two facts lead me to this conclusion.

First is the fact that it is not uncommon for an orthodontic supply company to receive a competitors' product from a customer, which it then examines and may even send to its manufacturer to copy (assuming no patents prohibit this practice). In that regard, AO representatives testified that AO often comes into possession of competitors' products for examination.

Moreover, Katz testified that one of the reasons a company, like GAC for example, engages in this practice is so that its sales representatives know how their product compares to competitors' products. It is reasonable to infer that GAC's competitors are constantly learning about GAC's products in an effort to compete in the marketplace.

Second, Harvel testified that, although the angulation and torque specifications of each product are "confidential," this information is published in GAC's catalog, which is available to non-GAC employees. Therefore, non-GAC employees, by virtue of browsing GAC's catalogue, would have easy access to the very information that GAC now claims is confidential.

Simply put, information about the architecture and design of GAC's products is not "not generally known in the trade or industry in which the Company is engaged." The orthodontic industry appears to be a small one. Each supply company knows who its competitors are and the

products that each company is marketing and selling.[5]  Indeed, the hallmark of success in such a close-knit industry (aside from establishing good customer relationships) is knowing what the competitor is selling so as to advance innovation and be able to explain to prospective customers how one's products stack up against those of a competitor.  The orthodontic supply companies' familiarity and study of competitors' products, as well as the architectural and design information being published in GAC's catalogue and disseminated to orthodontists, leads to a conclusion opposite to that propounded by GAC.  Stated another way, GAC's product design information is generally known in the orthodontic industry.  Thus, it is not "confidential information."

**D. Contact Information and Schedules**

I fail to see how information about whom to contact at a particular orthodontist's office and when is the best time to contact that person is "confidential information."  First, such information does not appear to be about "the needs and requirements of said customers."  GAC has not put forth any evidence indicating that customers needed or required sales representatives to contact them at any particular time in order to do business with GAC.  And, this information certainly does not fit into any other category of information set forth in the Agreement.  Most importantly, GAC did not offer any evidence about whether Thiesing even acquired information about the best time to contact particular customers.

Second, knowing who it is that a sales representative must speak with at a particular office is as easy as calling the office or stopping by the office and asking for the person responsible for obtaining office supplies.

---

[5]  Mike Harvel of Dentsply even testified that he is familiar with the type of products that AO is selling.

For these reasons, I am not persuaded that the contact information and the schedules of the contact people at each office constitute "confidential information" for purposes of the Employment Agreement. Instead, this information was, and is, out there for everyone to discover.

**E. Names of Existing or Future Customers, Clients, and GAC Accounts**

Furthermore, I am not persuaded that the names of GAC's existing or future customers, clients, and GAC accounts constitute "confidential information." First of all, the identity of most orthodontists is published in the AAO directory listing. This listing is available for all orthodontic supply companies to see. Moreover, orthodontists' names are also published in the yellow pages of the phonebook. In addition to these public avenues of access to orthodontists' names, a sales representative need only ask an orthodontist who his supplier is in order to link the customer with the supplier. Therefore, the names of GAC customers are generally known in the orthodontic industry.[6]

**F. Final Observations**

As previously suggested, the defendants have not shown that they ever made any kind of effort during Thiesing's employment to treat any of the above information as confidential. Although a few email communications to Thiesing included a notation that such emails contained confidential information, further inspection reveals that the confidential information designation is one that is automatically generated. Moreover, merely labeling something as "confidential" does not mean that what is contained therein is "confidential" for purposes of the Employment Agreement. *See Eutectic Welding Alloys Corp v. West*, 160 N.W.2d 566, 570 (Minn. 1968) ("The mere fact that a

---

[6] The defendants have not even suggested how the names of future customers can be considered "confidential information," particularly if these customers are not even known to GAC or any of its sales force. To the extent that an orthodontist wants to buy GAC products but is not yet a GAC customer, I fail to see how GAC has a legally protected interest in such information.

'confidential' label is attached to information is not itself sufficient to elevate ordinary sales information to secretive stature.").

Nor did the defendants demonstrate that they took any steps to preserve the secrecy of any information Thiesing may have put to memory while a GAC employee.[7] *See Alpine Glass, Inc. v. Adams*, Nos. C4-05-804, C5-02-1010, 2002 WL 31819910, at *6 (Minn. Ct. App. Dec. 17, 2002) (noting that the employer presented no evidence that it took steps to preserve the secrecy of any information, including the customer list, contained within a binder that the former employee took with him upon leaving to work for a competitor). It seems to me that if the defendants truly considered certain information disclosed to, known by, or acquired by Thiesing to be confidential, they would have taken serious steps to protect its disclosure. However, they did not do that.

One final observation. It seems that, in the defendants' view, the mere fact that any information is not generally known in the industry would be sufficient in and of itself to make it "confidential" under the Employment Agreement, so long as it is information about the "needs and requirements of [the] customers."

But this is a slippery slope. What about information concerning the customer's family situation? What if Thiesing had learned about a customer's need to take time off in order to handle, for example, a long-term illness in the family? Certainly knowing such fact might enhance his ability to sell products to the customer, maybe not now, but at a later time. Would this be "confidential information"?

_____

[7] The defendants have presented no evidence demonstrating that Thiesing took any written information with him upon leaving GAC.

And what about a customer's strongly-stated desire (i.e.,"need or requirement") to be entertained before he will purchase products; for example, by being taken to a football game? Is this "confidential information"?

If indeed the above examples do fall within the definition of "confidential information," then it seems to me that any information about a particular customer's personality that is not generally known in the trade or industry would be "confidential information." Following this line of logic would lead to the conclusion that virtually any information about a customer that Thiesing may have learned over the years while he was a GAC employee that was not known by every other salesperson in the industry and that might give him a leg-up with a particular customer is "confidential information."

To place this notion into a real context, <u>any</u> information that Thiesing may have learned about a customer, such as the names and ages of his/her children (to be used to satisfy the customer's need to have his or her family acknowledged); whether he/she likes to play golf (to be used to pamper the part of the customer's ego that wants you to ask them, "Hey, how's your game?"); whether he/she is a Packer or Viking fan[8] (to be used to satisfy the customer's need to "make small talk" about sports, e.g., "Hey, how about those Vikes?") is "confidential information" because it could make sales conversations easier to conduct and thereby increase sales. That is to say, it could arguably enhance the marketability of a product.

In my opinion, the defendants are seeking to squeeze from the Employment Agreement way too much protection for their business. They are trying to "place way too much baggage on the wagon." After all, such little nuggets of information would have little if anything to do with the orthodontic "needs and requirements of [the] customers." Rather, personal information is something

--------

[8] No doubt there are few, if any, Bear fans in Minnesota, Wisconsin and the Dakotas.

Case 2:09-cv-00359-WEC   Filed 09/07/11   Page 19 of 24   Document 91

that is acquired through a salesperson's experience and skills, often contributing to the employer's good will with its customers.

In *Jim W. Miller Construction, Inc. v. Schaefer*, 298 N.W.2d 455 (1980), the Minnesota Supreme Court stated the following:

> [T]he fact that an employee has during the course of his employment acquired nonconfidential information and skills that are not secret processes cannot support the enforcement of a restrictive covenant. "No restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but 'skillful variations of general processes known to the particular trade.'"

*Id.* at 459 (quotation omitted). The defendants' efforts here are tantamount to depriving Thiesing of the "right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment." The law of Minnesota does not allow them to do this. Rather, Minnesota law is clear that salespersons should "be able to ply [their] trade" by putting to use abilities, to the extent they are derived from generally known sources, gained through experience and skills acquired while on the job. *See Jostens, Inc. v. Nat'l Comp. Systs., Inc.*, 318 N.W.2d 691, 701-02 (Minn. 1982).

If Dentsply had wanted to restrict a former employee from having any contact with his previous Dentsply customers for a certain period of time, it could have drafted a non-compete agreement with such a provision. But, Dentsply did not do that. Instead, Dentsply chose to present to its employees a "one-size-fits-all" agreement, in which the term "confidential information," which was the lynchpin of the agreement, was defined with the expectation that it would apply to all employees alike, regardless of the kind of information he or she gained while working for Dentsply.

And so, because I have determined that the defendants have not shown that Thiesing breached his Employment Agreement, the tortious interference with contract counterclaim fails as well. For there to have been any tortious interference of contract, AO would have to be found to have

20

intentionally procured a breach of Thiesing's contract. Because there was no breach, any claim predicated upon that breach must be rejected. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

## IV. DAMAGES

Finally, even if the defendants had proven that Thiesing breached his Employment Agreement with the defendants, and even if Katz were qualified to give lay opinion testimony on GAC's lost profits, the defendants have nevertheless fallen short of proving their damages. To prove damages, the defendants must establish by a preponderance of the evidence that

> (a) profits were lost, (b) the loss was directly caused by the breach of the covenant not to compete, and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation.

*B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979) (citing *Faust v. Parrott*, 270 N.W.2d 117 (Minn. 1978)).

There is no question that the defendants lost profits during the time period in question. However, the defendants did not prove by a preponderance of the evidence that such loss was directly caused by Thiesing's alleged breach of the covenant not to compete. As documented by Dentsply representatives, the defendants were experiencing business related problems attributable to the change in management in the years before Thiesing left; and the problems persisted upon his departure from the company. Orders were being lost, delayed, and filled incorrectly. Customer service was suffering. Billing issues arose. Indeed, Dr. Miller testified that he was going to switch from GAC for orthodontic supplies even before knowing of Thiesing's going to work for AO. The defendants really do not know why any particular account formerly credited to Thiesing left GAC—it may very well be that many, like Dr. Miller, left not because Thiesing left, but because GAC was experiencing such widespread and persistent problems. To say that Thiesing is directly responsible

Case 2:09-cv-00359-WEC   Filed 09/07/11   Page 21 of 24   Document 91

for all of the defendants' lost sales, therefore, is a gross overstatement, particularly when the amount of lost profits on many of GAC's accounts was nowhere to be found in AO's revenue stream.

Indeed, another orthodontist, Dr. Fuchs, switched from the more expensive self-ligating bracket to a twin bracket in order to lower his overhead. Two other orthodontists, Dr. Sletten and Dr. Lawson, split their practice and made two separate accounts. It also appears that some orthodontists retired during this time span. These considerations are not reflected in the defendants' damage calculation that was presented at trial.

Nor did the defendants analyze the sales trends leading up to Thiesing's departure. The economic downturn of 2008/2009, coupled with GAC's customer service and product-related problems, would have been important considerations in determining why sales were declining. Additionally, the defendants did not take into consideration whether not having a replacement in Thiesing's territory for nearly six months had any impact on its lost profits (not to mention that the replacement GAC hired had no prior experience in the orthodontic industry, as did neither the next replacement who was hired in the fall of 2010). Finally, Wildman indicated that the defendants' accounting for "saved costs" was incomplete, including payroll costs and other sales related expenses. In the end, the defendants have not persuaded me that any claimed causally related loss was calculated with reasonable certainty.

Because of the defendants' failure of proof in this regard, it is difficult to reach any conclusion other than to say that the defendants' lost profits calculation (including the defendants' post-trial modified calculation) is speculative.

To be sure, the defendants rely on *Ball* for the following proposition:

[O]nce a plaintiff raises a reasonable inference as to the amount of lost profits *caused* by a defendant's breach of a covenant not to compete, the defendant is liable for such amount unless evidence is presented to rebut the inference and to establish that the loss was caused by factors other than the breach.

22

*Ball*, 279 N.W.2d at 817 (emphasis added). But the defendants' devotional reliance on *Ball* is somewhat misplaced. The defendants in this case are not entitled to a reasonable inference as to the amount of lost profits caused by Thiesing's alleged breach precisely because they failed in the first instance to establish a causal relationship between Thiesing's breach (assuming he breached the restrictive covenant) and their claimed decline in sales. [9]

## V. CONCLUSION

In conclusion, and for all of the foregoing reasons, this court finds that Thiesing did not breach his Employment Agreement with the defendants, and therefore, AO did not tortiously interfere with Thiesing's and the defendants' contractual relationship. Moreover, even assuming *arguendo* that Thiesing did in fact breach the non-compete provisions of the Employment Agreement, the defendants have not proven by a preponderance of the evidence the damages directly caused by such breach.

**NOW THEREFORE IT IS ORDERED** that the plaintiffs' motion to exclude Marc Katz's testimony and report as they relate to the issue of damages be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion to strike or, in the alternative, for leave to file a post-trial surreply be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that GAC and Dentsply shall take nothing from Thiesing and AO on their counterclaims;

**IT IS FURTHER ORDERED** that this action be **DISMISSED**;

---

[9] After the defendants filed their reply brief, the plaintiffs filed a motion to strike Exhibit A to the defendants' post-trial reply brief or, in the alternative, for leave to file a surreply that responds to arguments that the defendants' raised for the first time in their reply brief. The plaintiffs' motion will be granted in part and denied in part. To the extent that the plaintiffs seek to strike Exhibit A, their motion will be denied. To the extent that the plaintiffs seek to file a surreply brief, their motion will be granted.

23

**IT IS FURTHER ORDERED** that judgment shall be entered accordingly.

**SO ORDERED** this <u>7th</u> day of September 2011 at Milwaukee, Wisconsin.

**BY THE COURT**:

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge